No. 2033
Second Circuit Appeal

## LUCKETT & HUNTER v. TEXAS & PACIFIC RAILWAY CO. AND THE DIRECTOR GENERAL OF RAILROADS

(January 12, 1925, Opinion and Decree)
(March 2, 1925, Rehearing Opened with Reservations)
(October 21, 1925, Reversed and Dismissed on Rehearing. Sec. 2 La. App. 1554.)
(March 30, 1925, Rehearing Granted)
(March 1, 1926, Decision Supreme Court, judgment first rendered by Court of Appeal, which affirms judgment District Court, reinstated.)

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Mandate—Par. 104.**
The authority of party signing bill of lading for the shipper is sufficiently shown by shipper's evidence, thus making it possible to introduce the bill of lading in evidence.

2. **Louisiana Digest—Carriers of Passengers and Goods—Par. 167.**
Under the "Live Stock Bill of Lading" the amount of recovery is limited to $150.00. The evidence shows more damage but the liability of the carrier is limited to $150.00, which is the amount of damages allowed.

ON APPLICATION FOR REHEARING

3. **Louisiana Digest—Carriers of Passengers and Goods—Par. 125, 166.**
The evidence shows that shipper warned an employee of the railroad of the defective condition of the car and the employee promised to fix it but did not. Under these conditions the railroad or director general, whoever had charge of the railroad's operation, is negligent and liable for damages resultant.

4. **Louisiana Digest—Appeal—Par. 625.**
The findings of the trial judge that the defective condition of car was the cause of injuries to a mule shipped therein and that these injuries eventually caused the death of the mule, being clearly correct are affirmed.

Appeal from the Thirteenth Judicial District Court, Parish of Rapides. Hon. J. A. Williams, Judge.

REYNOLDS, J.

Action by Luckett & Hunter against Texas & Pacific Ry. Co. for $400.00 damages for mule and $50.00 penalty for failure to settle claim in thirty days.

Defendant denied liability on the ground that it received the shipment of mules from the Public Belt Railroad of New Orleans and that the damage did not occur on defendant's line of railroad.

In the alternative, defendant claimed that plaintiff's damage was limited by the "Live Stock Bill of Lading" to $150.00.

There was judgment for plaintiff for $150.00 and defendant appealed.

Judgment affirmed.

Provosty & West, of Alexandria, attorneys for plaintiff, appellee.

Peterman, Dear & Peterman, of Alexandria, attorneys for defendant, appellant.

OPINION

This is a suit for $400.00 damages for the value of one mule damaged in shipment from New Orleans, La., to Alexandria, La., and for $50.00 penalty for failure to settle claim within thirty days.

There is a large transcript in the case and many interesting questions have been presented for decision, and they have been ably argued, but we find it unnecessary to review most of them for the reason that the entire case may well be disposed of on the "Live Stock Bill of Lading," introduced in evidence by the defendant, over plaintiff's objections. Plaintiff at the time this evidence was offered made several objections to its being allowed, but he has only urged one in his brief, to-wit: That the "Live Stock Bill of Lading" had not been identified, that is, that the party signing the bill of lading had not been shown to have had authority to sign same. The bill of lading was signed by M. Glaser, H. M. Sheppe. The objection that there is no evidence showing that Mr. Glaser had

the authority to bind the plaintiffs is disposed of by Mr. Luckett, one of the plaintiffs, who testified (Trs. p. 16), "I will tell you how we ship." Anyone who happens to be around the office then was authorized to sign the contract.

"Q. So that Glaser, he was the shipper?
"A. I don't know whether he signed that or not, couldn't say.
"Q. But you have just stated what the custom is—he had authority to sign it?
"A. Yes, sir."

Under this evidence of defendant, we think the bill of lading was admissible in evidence and especially so since it is the basis of plaintiff's suit, and without it there existed no contractional relations between plaintiff and defendant.

Under the bill of lading the plaintiff is entitled to collect for any damage suffered by the mule in shipment from New Orleans, La., to Alexandria, La., for the reason the T. & P. R. R. Co., under the very terms of its bill of lading contracted with the plaintiffs to ship a car of mules and horses for the plaintiff from New Orleans, La., to Alexandria, La., and there is no contractional relation between plaintiff and any one other than the T. & P. R. R. Co.

The shipment originated in New Orleans, La., and was to be shipped to Alexandria, La., by the T. & P. R. R. Co., and under this condition there cannot arise a question as to the liability of connecting carrier. Plaintiff entered into a contract with the T. & P. R. R. Co. in New Orleans by which the T. & P. R. R. Co. bound itself to receive a shipment for plaintiff in New Orleans and ship same to plaintiff in Alexandria, La. We hold, therefore, that the defendant is liable to the plaintiff in damages.

As to the amount of damages, we think there is abundant evidence to establish that plaintiff sustained damages, at the very least, to the amount of $150.00. The invoice price of the mule was $275.00. Dr. S. B. Staples, a veterinary surgeon, testified (T. p. 31) that the mule died from the bruises received. The contract under which the shipment was made limited defendant's liability to $150.00, for which amount there was judgment for plaintiff in the lower court.

For the above reasons the judgment appealed from is affirmed at defendant's cost.

---

ON APPLICATION FOR REHEARING

CARVER, J. This suit was brought against the Director General of Railroads and the Texas & Pacific Railway Company. Notwithstanding the fact that the railway company was dismissed from the suit on its exception that at the time of the alleged injury its railway was being operated by the federal government, the case seems to have been tried as though the railway company and not the director general was the defendant and as though the main question was whether the railway company was or was not negligent, although when the decision was rendered it was, of course, rendered not against the railway company but the director general. Even in this court the case has been argued as though it turned on the question of the railway company's negligence, and the original opinion herein discussed the case as though between the plaintiffs and the railway company. Really, though, the case is between the plaintiffs and the Director General of Railroads and the question is whether he was or was not guilty of negligence.

We do not mean to hold against the ruling in McHenry Horse Exchange vs. Illinois Central R. R. Co., 148 La. 49, 86 South. 649, that a railroad company is liable for the death of an animal in transit because it fails to show the cause of death where it is carried under a bill of lading providing that the railroad company should not be

liable unless its negligence caused the injury.

We think, though, that the director general was negligent in loading the mule on a car which was defective.

The proof shows that this mule, together with a number of other animals, was loaded on February 25, 1920, on a car at the Press street stockpen of the New Orleans & Northeastern Railroad Company in New Orleans to be switched to its connection with the Texas & Pacific Railway for shipment to Alexandria. It was carried over the lines of the New Orleans & Northeastern, Public Belt, and Trans-Mississippi Terminal Railroad Companies and delivered to the Texas & Pacific Railway Company.

This car was defective, having the clip or hasp on the bottom of the door broken, allowing too much play between the door and the floor of the car. According to the testimony of Barchy, the door ought to fit tight. The condition of the car was observed by Glaser, the shipper and dealer from whom plaintiffs bought the animal, and also by Luckett, one of the plaintiffs, himself, who was present when the car was loaded.

Both of these witnesses state that they called the attention of Slim, an employee of the New Orleans & Northeastern Railroad Company, to this condition, and he promised to fix it. Luckett says, further, that he asked Slim to furnish another car or fix that one and that Slim replied they did not have any other car but that he would fix it.

While in transit from the stockpen where it was loaded to the Texas & Pacific Railway the mule got its foot and leg between the car door and the floor of the car, and on arrival at the Texas & Pacific Railway its leg was caught between the door and floor so firmly that the door had to be opened to free the leg and a platform placed under the mule to enable it to get up.

It is clear that the condition of the car was the proximate cause of the injury, and that it was negligence to place the mule in the car.

We think the court warranted in taking judicial notice of the fact that the director general was operating the New Orleans & Northeastern Railroad and that his transportation of the mule began not at the time he issued the bill of lading but at the time it was loaded at the New Orleans & Northeastern stockpen.

In view of the fact that Slim, with whom Glaser and Luckett seem to have dealt in the matter of the loading, promised to fix the car, we hardly think Luckett guilty of contributory negligence in permitting the loading in the defective car.

The testimony convinces us that injury to the mule by reason of her leg being caught, as stated, was considerable. It is questionable whether it ultimately caused the death of the animal, but certainly the injury was quite extensive according to the testimony even of defendant's witnesses, and as shown by the fact that it was kept for about nine days before defendants considered it fit to continue its journey.

The testimony of Luckett shows that on arrival at Alexandria it was in such bad condition that in carrying it to his barn the mule got down on the ground after going about 100 yards and had to be helped up, and that on the way to the barn they had to let it rest for ten minutes after each 100 yards or so. He further testifies that he placed her in the care of a veterinarian who treated her about a month; that the feed, extra attention and care of the mule cost about $40 or $50, and the veterinarian's charge $25. He also states that he did not use the mule at all because it was sick, and finally sold

her at a loss and with a guarantee that if not all right he would make it good, which he did by refunding the purchase price.

Counsel for defendants question the truth of this testimony, claiming it was an afterthought; but we do not feel warranted in rejecting it as untrue. The mule seems to have been sold some time in April and no account is given if its condition or the care and treatment to which it was subjected between that time and August 4th, when it died.

Dr. Stiples, the veterinarian, testified that he treated the mule while in Luckett & Hunter's possession for about thirty days; that he saw her every day and gave her medicine; and that he performed an autopsy, finding that the mule had an extremely enlarged heart, distended to such an extent that the walls were about the thickness of a sheet of paper, and that the liver and kidneys were also enlarged, the lungs congested and the right chest wall showing an old clot.

He further says that the direct cause of death was the hypertrophied condition of the heart. He also says that excessive and continued fever would cause the condition that he found in the mule, and that the heart failure of which the mule died could have been caused by the bruising and mashing received in transportation. Also that in his opinion it was caused by those bruises. On cross-examination he said that in his opinion the animal did not die from the wounded hind leg. In reply to questions by the court he stated that the postmortem showed there had been a tremendous blow on the right side because of the clot; that the pain and continued fever would cause the condition mentioned. That with a hypertrophied heart a mule might last for months, probably years, but with hypertrophied condition of liver and kidneys the extreme limit would be ninety days. That at the time he treated her he knew the heart was hypertrophied to a certain extent, but could not determine as to hypertrophy of liver and kidneys, and called that a state of depression; that he knew she was pretty sick, and that something was wrong with the liver but could not tell exactly what it was. He further stated that when he first saw the mule her right hind leg was wrapped up to the stifle joint with absorbent cotton and the bandage applied over it; that the wound showed that some antiseptic powder or dry powder had been applied to the lacerated places, and that she was skinned all over at various places. Also that she was in bad shape; sore all over; and that after the external wounds healed up and especially that on the right hind leg, which was very sore and stiff, she moved around much better than when he had first seen her. Also that when he discharged her there was nothing radically wrong that he could put his fingers on; only general depression. That she ate all right and seemed to move around all right, but seemed depressed. He also said that at the time he discharged her the swelling was not completely gone and that she moved her leg with a perceptible stiffness in it.

Luckett and Glaser both testify that the mule, when originally shipped, was in good condition.

Even if the death of the mule was not due to the injury received in transit, we are satisfied that these injuries were considerable and that the judgment of the lower court allowing $150.00 does substantial justice between the parties.

Rehearing refused; but right reserved to the director general to apply for a second rehearing if he claims that at the time the mule was loaded at the stockpen of the New Orleans & Northeastern Railroad he was not operating that railroad.